**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**


**NANCY J. TODD,**

                **Plaintiff,**

**v.**

                                **Civil Action No.2:07cv89**


**MICHAEL J. ASTRUE,**

                **Defendant.**


<u>**Report and Recommendation**</u>
<u>**Social Security**</u>

**I. <u>Introduction</u>**

**A. <u>Background</u>**

       Plaintiff, Nancy J. Todd ("Claimant"), filed her Complaint on November 5, 2007, seeking Judicial review pursuant to 42 U.S.C. § 405(g) of an adverse decision by Defendant, Commissioner of Social Security ("Commissioner").[1] Commissioner filed his Answer on February 2, 2009.[2] Claimant filed her Motion for Summary Judgment and Brief in Support of Motion for Summary Judgment on February 27, 2009.[3] Commissioner filed his Motion for Summary Judgment and Brief in Support of Motion for Summary Judgment on March 23, 2009.[4]

---

[1]Dkt. No. 1

[2]Dkt. No. 12

[3]Dkt. No. 15

[4]Dkt. Nos. 16 and 17

**B.  The Pleadings**

    1.  Plaintiff's Memorandum Incorporating Statement of Facts in Support of Her
Statement of Errors

    2.  Defendant's Brief in Support of His Motion for Summary Judgment

**C.  Recommendation**

I recommend that:

    1.  Claimant's Motion for Summary Judgment be **DENIED**.  The ALJ's conclusion that there is sedentary work existing in significant numbers in the national economy that Claimant could perform, given her age, education, work experience and residual functional capacity is supported by substantial evidence.  Furthermore, the ALJ did take into account the combined effect of all disabilities Claimant suffered from when he made the decision.  In this case, there is substantial evidence to support the ALJ's decision such that it should be affirmed.

    2.  Commissioner's Motion for Summary Judgment be **GRANTED** for the same reasons set forth above.

## II.  Facts

**A.  Procedural History**

Claimant filed an application for Supplemental Security Income on October 23, 2003, alleging disability since August 14, 1994, due to heart impairment, diabetes, asthma, back pain, weak arches, arthritis, high blood pressure, Ashman's, and anemia.  (Tr. 16).  The West Virginia Disability Determination Service denied the application initially on April 16, 2004, and on reconsideration September 23, 2004.  (Tr. 16).  On October 20, 2004, Claimant requested a hearing before an Administrative Law Judge (ALJ).  (Tr.16).  Claimant received a hearing before

an ALJ on August 31, 2005. (Tr. 16). On November 4, 2005, the ALJ issued a decision adverse to Claimant. On November 16, 2005, Claimant requested review of the ALJ's decision. (Tr.10). The Appeals Council issued a form letter on September 11, 2007, denying Claimant's request for review. (Tr.12). Having exhausted her administrative remedies, Claimant filed this action which proceeded as set forth above.

## B. Personal History

Claimant was 48 years old on the date of the August 31, 2005, hearing before the ALJ. (Tr. 781). Her date of birth is October 3, 1956. (Tr.16). Claimant completed high school and has no prior relevant work experience.

## C. Medical History

Medical history shows that Claimant has had a history of heart problems. (Tr. 273). On January 8, 2003, Claimant received emergency room treatment for high heartbeat, fluttering, palpitations, chest pain, and shortness of breath. (Tr. 273). She was also diagnosed with sick sinus syndrome. (Tr. 274).

On January 18, 2003, Claimant again received emergency room treatment; this time for wheezing, shortness of breath, and cardiac ectopy. (Tr. 261). During this visit she was diagnosed with pneumonia. (Tr. 247).

On January 27, 2003, Claimant was admitted to the emergency room once again for wheezing, shortness of breath, and dry cough. (Tr. 247). On January 29, 2003, Claimant again sought emergency room treatment for fluttering. (Tr. 235). EKG testing revealed atrial fibrillation and a chest x-ray revealed some mild increase in central vascularity. (Tr. 235).

On February 2, 2003, Claimant received emergency room treatment for atrial fibrillation.

(Tr. 152). Then, on February 3, 2003, Claimant was examined by Allen P. Phemester, R.N., M.S.N., F.N.P.-C., for a follow-up examination and he found that Claimant's heart was in normal sinus rhythm, her lungs were clear, and her extremities were free of edema. (Tr. 152).

On February 11, 2003, Claimant was examined by F. Matthew Abraham, M.D., and he noted that Claimant was complaining of shortness of breath and that she had recently been diagnosed with diabetes. (Tr. 220). He also noted that Claimant could talk in long sentences and that her heart was in regular rhythm with a systolic murmur throughout. (Tr. 220). A chest x-ray revealed mild cardiomegaly and revealed minimal peribronchial. (Tr. 225).

Claimant received an x-ray on March 2, 2003, that revealed degenerative changes in Claimant's lumbar spine. (Tr. 218). On March 3, 2003, Claimant once again received emergency room treatment for complaints of fluttering. (Tr. 192). A chest x-ray was conducted and revealed cardiomegaly and central vascular congestion with no focal alveolar process. (Tr. 196).

Claimant was admitted to Camden Clark Memorial Hospital for acute chest pain, shortness of breath, diaphoresis, nausea, and lightheadedness on March 12, 2003. (Tr. 460). On March 14, 2003, Claimant underwent cardiolite imaging and an EKG revealed no significant changes or arrhytmias. (Tr. 495). The cardiolite scan was considered normal. (Tr. 502). Claimant then received a pacemaker in her left chest wall on March 18, 2003.

On April 9, 2003, Paul R. West, D.O., indicated that Claimant could not walk more than 200 feet without stopping and that this condition was considered permanent. (Tr. 602). On April 19, 2003, Claimant was evaluated for burning and tingling in her right hip. (Tr. 184). William L. Noble, M.D., performed an x-ray and reported degenerative changes in both hips,

bilateral spurring from the wings of the ilia, and mild degenerative changes within the SI joints and spaces. (Tr. 184, 189).

On May 20, 2003, Claimant was re-admitted to Camden Clark Memorial Hospital to change her antiarrhythmic therapy. (Tr. 119). Dr. Gnegy noted Claimant's heart was in regular rate and rhythm without murmur, rub, or gallop. (Tr. 120-135). Claimant was discharged on May 23, 2003, in stable condition with normal sinus rhythm and was recommended a low fat, low salt diet and permitted activity as tolerated. (Tr. 120).

On December, 4, 2003, Claimant was examined by Ralph S.Augustini, M.D., and he reported that Claimant experienced chest pain and palpitations with shortness of breath "on a daily basis." (Tr. 546, 548). Claimant underwent left atrial ablation therapy on February 12, 2004. (Tr. 545). On February 15, 2004, Claimant was again admitted to the emergency room for treatment, complaining of chest pain. By February 17, 2004, Claimant's heart was regular and her cartoids and lungs were clear after receiving treatment. However, Claimant was now complaining of back pain. (Tr. 308). Back x-rays of Claimant revealed osteoarthritis. (Tr. 308). Claimant was then discharged on February 19, 2004. (Tr. 309).

On May 28, 2004, Claimant returned to the emergency room complaining of palpitations. (Tr. 342). Claimant received an EKG which revealed moderate concentric left ventricular hypertrophy, moderate pulmonary hypertension, undetermined tricuspid regurgitation, and biatrial enlargement. (Tr. 583). Upon discharge, Dr. Nilsen reported that Claimant was in good condition. (Tr. 344).

In July 2004, Dr. Augustini reported that Claimant continues to have daily palpitations , but that Claimant had "much improvement" after ablation therapy. (Tr. 531). He also

recommended that Claimant undergo follow-up ablation treatment in the near future.  (Tr. 531).

On August 2, 2004, Claimant was examined by Christopher Edmands, D.O., who noted that Claimant's heart was in regular rhythm.  (Tr. 559).  He also noted that Claimant had normal breathing but did wheeze.  (Tr. 559).  He further noted that Claimant had some decreased range of motion in her spine.  (Tr. 559).

On September 9, 2004, Dr. Gnegy reported that Claimant would have difficulty with physical activity and that her long history with atrial fibrillation is "unresponsive to medical therapy."  (Tr. 577-580).

In December 2004, Claimant received reports that she was "doing much better" and had a "marked improvement" in her condition.  (Tr. 713-714).  Even though these reports had her doing much better, she still felt fluttering and palpitations on occasion.  (Tr. 713-714).  She also received pulmonary testing and CT scans during December 2004 and January 2005.  Testing in December revealed restrictive ventilatory defect and testing in January was within the normal range, but revealed airway resistance.  (Tr. 690, 692).  The CT scan revealed no evidence of pulmonary vein steinosis or acute cardiopulmonary disease. (Tr. 648).

On February 25, 2005, Dr. Augustini treated Claimant and noted she was still having very slight palpitations, lasting about one to two minutes each time.  (Tr. 708).  He also reported that Claimant was doing well overall and that her heart rate was "controlled."  (Tr. 708).

In June 2005, Claimant received another x-ray on her chest and it confirmed that mild cardiomegaly persists.  (Tr. 661).  Dr. Edmands further noted that Claimant had no chest pain, decrease in exercise tolerance, breathing difficulty, or dyspnea.  (Tr. 746, 748).

**D.  <u>Testimonial Evidence</u>**

Q      Ms. Todd, how old are you?

    A      I'm 48.

    Q      You'll be 49 in October, right?

    A      Right.

    Q      And you have two years of college?

    A      Yeah, I didn't get a degree.

                      *              *              *

    Q      Do you have any job history, work history?

    A      Not after '77.

    Q      Your height and weight?

    A      I'm 5' even, 260.

    Q      Medical status?

    A      Single.

    Q      Do you live alone?

    A      Yes.

    Q      Do you have any children?

    A      No.

    Q      Do you live in a house?

    A      Yes.

    Q      In New Martinsville?

    A      Right.

Q      Do you have a driver's license?

A      Yes, I do.

Q      How many miles do you typically drive in a week would you say?

A      I don't drive anymore.

Q      How come?

A      Because I fall asleep.

Q      Narcolepsy?

A      No, I have sleep apnea but I'm just having so much trouble with it I can't keep awake during the day.

                                 *             *             *

Q      Okay.  Do you smoke?

A      No.

Q      Drink?

A      No.

Q      Any drugs like marijuana?

A      No.

Q      Are you right or left-handed?

A      Right.

                                 *             *             *

Q      Ms. Todd, you allege disability as a result of multiple problems, and we'll talk about those one at a time.  The primary problem for which you're treating appears to be your heart?

A        Right.

Q        Okay. What symptoms do you experience as a result of your heart problem?

A        Well, I have the atrial fib, which it flutters and it makes me weak and really tired.

Q        How often do you have that?

A        The atrial fib now they've got it down to where after the surgeries they've got it down to where it may act up maybe once a day or something for maybe five to ten minutes.

Q        Now you had a pacemaker implanted, is that correct - -

A        Right.

Q        - - and that was back in March of 2003?

A        Correct.

Q        And since then you've had two other procedures?

A        Correct.

Q        Two other oblation procedures?

A        Right.

Q        And that did - - has seemed to help a bit?

A        That seemed to help a lot because it went from like 16 hours at a shot down to like five minutes or so.

Q        Okay. You said it causes you to be fatigued and weak?

A        Right.

Q        Do you have chest pain?

A        Yes.

Q        How often do you have the chest pain?

A       Usually every, I'd say every few days or so.

Q       And describe that pain for me.

A       Sometimes it's not, you know, real strong but sometimes it's strong enough to where I have to take the Nitro.

Q       But what does it feel like?

A       It just feels like somebody is trying to put a knife in your heart or something, you know, it's just very painful.

Q       And how often is it to the degree that you need to take a Nitro?

A       Yeah, it's just usually about maybe I'd say a couple times each, you know, maybe every other week.  Usually about one every week or two.

Q       So a couple times a month you're saying?

A       Yeah.

Q       Okay.  And is it typically relieved with just one Nitro?

A       Usually, yeah.   Sometimes it has not been, so I've had to take a second.

Q       Have there been any recommendations made for you for future treatment of your heart and the atrial fib?

A       Well I went to see the surgeon Friday and he told me it was up to me whether I wanted to try the surgery again to see if it helped.

Q       And by surgery are you talking about another ablation?

A       The ablation surgery, yeah.  But I decided to wait and see what it does.

Q       Okay.

A       See if it gets any worse.

Q       Other than the heart problems is there anything else that you feel interferes with your ability to work?

A       My back.

Q       Okay.  What is it about your back that gives you difficulty?

A       Lots of pain in the back.  They said I have osteoarthritis in my spine so it gives me a lot of back pain, standing, sitting, bending, just basically just anything.

Q       Where's the pain located?

A       In my lower back.

Q       Does that pain travel anywhere?

A       Into my legs because my legs will go numb.

Q       Both legs?

A       Usually my right mostly and a lot of pain in my right leg.

Q       And how far down does the numbness travel?

A       Down to my knee.  If I sit for long periods it goes into my feet.

Q       And what type of treatment do you have for your back?

A       Basically they said there's nothing they can do for the osteoarthritis except for give me pain medication.

Q       And do you take pain medication for your back?

A       Yeah, I take pain medication.

Q       How often do you take pain medication?

A       Approximately about three times a day.

Q       And does that seem to help with the pain?

A    It helps with the pain but it puts me to sleep.  But with the pain it usually doesn't take care of it for the full eight hours and I'm not supposed to take it more than three times a day so I substitute Tylenol when I - -

Q    And how much Tylenol do you need to take for breakthrough pain?

A    Usually I take a dosage of two tablets, two of the 500 milligrams.  Usually I end up taking them approximately about, oh, I'd say at least three to maybe four times a day.  I have to take them at night too, I get up in the middle of the night and I have to take them in order to sleep.

Q    You've also been diagnosed with sleep apnea?

A    Right.

Q    You use a C-Pap machine?

A    Right.

Q    But you indicate you still have day time sleepiness?

A    Oh, yeah.  And I'm still having trouble even with that sleeping at night.

Q    A C-Pap machine hasn't really helped?

A    It helped at the beginning but it seems like here lately it's back to the old routine of not sleeping again.

                    *              *              *

Q    Okay.   Now you provided us with a rather lengthy list of your medications and we went over those prior to the hearing.  You're taking all of these medications as indicated on these two sheets?

A    Yeah.

Q       Any of the medications cause any bad effects or any side effects for you?

A       Well the pain medicine makes me sleepy.  And some of them give me terrible gas. I know they've had to change a few because of the rashes and things but mainly just the sleepiness from a lot of the medication.

Q       Now you also had some breathing problems?

A       Right.

Q       And you're taking inhalers for that?

A       Yeah, I have asthma.

Q       Okay.  And does the medication typically control the asthma?

A       Well, they put me on the Advair discus twice a day to help try to keep the asthma attacks down because I was having so many.  And it has helped.

Q       How many asthma attacks do you have currently?

A       Usually I don't have as many as I did before, I have maybe one a week or something now.  Before I was having them every day before they started the other medication.

Q       What type of treatment are you receiving for your medical problems, who is your primary doctor?

A       My primary doctor is Dr. Christopher Edmonds (Phonetic).

Q       And how often do you see Dr. Edmonds?

A       I see him about every three months.

Q       And what does Dr. Edmonds tell you about your condition?

A       He told me that I'm never going to be able to work or do anything, he said it's just going to get worse as I get older.   He also referred me to a specialist for some of it.

Q        How do you spend a typical day?  Just take me through what your normal routine is?

A        A typical day, I get up in the morning, usually I make the bed and usually I don't do a whole lot, I do some reading, watch TV.  It's hard for me to do housework or anything anymore and I've been getting where I spend most of my days going to doctor appointments.  I don't do a whole lot during the day, mainly it's just try to tidy up a little bit of the house if I can, if I feel like it.

Q        Do you do your own housework?

A        What gets done, yeah.

Q        Do you do your own cooking?

A        Yeah.  More microwave and box dinners anymore.

Q        You just cook for yourself?

A        Yes.

Q        Do you do your own grocery shopping?

A        Yes.

Q        Do you need any assistance with that?

A        I have to use the motorized carts when I go because I can't walk long enough to do it.

Q        Do you have any hobbies you still practice or paid in?

A        No.

Q        Anything you use to enjoy that you're no longer able to engage in?

A        Yeah.  I use to enjoy my gardening, and I can't do that - - basically I use to spend

a lot of time gardening but I just can't do it anymore.

Q    How long can you stand at one time before you need to sit down for relief?

A    I'd say about 15 to 20 minutes.

Q    And then what happens after 15 to 20 minutes?

A    Then my back starts hurting so bad and my legs and my feet because I have so much trouble with my feet now.

Q    How about sitting, how long can you sit without too much difficulty?

A    Well, I'd say about no more than a half hour without trying to stand up or something.

Q    How about lifting, what's the heaviest you can lift or carry without too much difficulty?

A    Without it hurting my back and stuff I'd say maybe a gallon of milk, whatever that would weigh.

Q    Does walking cause difficulty for you?

A    Yes.

Q    How long or how far can you walk without too much difficulty?

A    Not very long, I'd say less than a block.

Q    What would keep you from walking longer?

A    My back hurts and my legs and especially my feet.

Q    Do you nap during the day?

A    Yes.

Q    Every day?

A     Yes.

Q     How long are your naps generally?

A     Usually about two hours.

Q     And what's the reason for the naps?

A     Once I take a lot of the medication in the early afternoon usually it makes me so sleepy I can't keep my eyes open.

Q     What's to keep you from doing a job which was primarily a seated job, now you could stand up and change positions if you needed to, but you didn't have to do any heavy lifting, it wasn't a particularly stressful job.  Say that you were assembling something or sorting materials, what would keep you from doing a job like that?

A     My hands.   I have a lot of trouble with my hands going numb.  And now I've started having pains in my hands so I don't know what's causing that yet.

Q     Have you had any treatment for your hands?

A     When I first went to the doctor they said I do have carpel tunnel and they said I have arthritis in my hands.  But as far as the pains, I haven't seen a doctor on that to find out what's causing that yet.

Q     Is there anything else other than your hands that would interfere in your ability to do that kind of a job, a sit down type of a job?

A     If it's any kind of stress to it or anything like that, you know, any kind of stress will set my heart off.  And like I said, any time I sit very long or anything my legs go numb, even down to my feet.  And just being able to stand or sit, either one, it's a real problem sitting or standing or laying, (INAUDIBLE).

Q        Is there a position - -

A        It's just my leg is constantly in pain, my right leg is.

Q        Is there a position that's most comfortable for you?

A        Not really.  Because even when I lay down it hurts.  Like I said, my leg probably

hurts 99 percent of the time, it's just after awhile you get kind of oblivious to the pain a little bit.

ATTY        Thank you.  Those are all the questions I have, Your Honor.

RE-EXAMINATION OF CLAIMANT BY ADMINISTRATIVE LAW JUDGE:

Q        Ms. Todd, so the pacemaker was put in about when?

A        It was put in in March of 2003.

Q        And then you had, what were they called, ablations?

A        Heart ablations.

Q        What does that mean?

A        They go in through your groin area and they go inside your heart like they would

a catheterization  but they go in and they burn the nerve endings coming from your lungs to your

heart.

Q        So that somehow helps atrial fibrillation?

A        Yeah, somehow they said it's picking up signals from your heart to your lungs

and throws back up false signals and throwing in the extra beat.

Q        Okay.  So the last one of those was - -

A        August.

Q        - - in '05 or '04?

A        '04.

Q     Okay.  And then is Augistina (Phonetic) your cardiologist in Columbus?

A     Right.

Q     He seemed to think that it's really helped a lot, is that true?

A     Yes.

Q     But you're stilling having a couple of episodes of angina a month?

A     Right.

Q     Requiring Nitroglycerin?

A     Right.

                    *                    *                    *

Q     And then the hypertension, do you take medication for the hypertension?

A     Yes.

Q     And it is under control?

A     They hypertension, yes, it's pretty much under control with the medication.

Q     How are you doing with the sleep apnea?

A     Not very well.

Q     You have a C-Pap machine?

A     Right.

Q     And do you use it every day?

A     Yes.  For naps and at night.

Q     So you still have - - what is sleep apnea, where you fall asleep like you told me when you're driving and you don't want to drive because of that?

A     Well, sleep apnea mainly affects you at night where my throat closes off to where

I'm not breathing. They said I would stop breathing during the night several times. They said in one night in an eight hour period when they tested me they said I stopped breathing like 80 some times. They said that keeps your throat open to keep - - the pressure from it keeps it open so that the oxygen can get into your lungs. And it also helps you to get into the different stages of sleep that you need to get into. Because I was not getting into stage three or four at all.

Q      Is that - -

A      And it makes you tired.

Q      Is there improvement?

A      At first it really helped, at first it really helped. But then in the last, I'd say two or three months it's not doing as well, I'm back to where I'm not sleeping again.

Q      Okay. How much sleep did you get last night?

A      I'd say about three hours maybe.

Q      All together?

A      All together.

Q      How much at one time?

A      About two and then I just kept waking up.

                         *                *                *

A      Dr. Edmonds is my general practitioner.

Q      Okay. And I think he recommended weight loss?

A      Yes.

Q      It was him.

A      Well I know Dr. Bear (Phonetic) did.

Q       Okay.  Have you had any success?

A       No.  It's hard to exercise because my feet and my legs and my back hurt so bad. And they talked about gastric bypass but Dr. Naggy (Phonetic) said no way, my cardiologist, he said not with my heart.

Q       Are you still on that beta pace medication?

A       I'm on the generic brand for it, the Solotoff, yes.

Q       You're not clear of what - - you're not sure of what is wrong with your hands?

A       No, not yet.  I know I have arthritis in my fingers but I don't know what's causing the pain yet.  I haven't been to see the doctor for that yet.

Q       Do you have trouble with grip strength or fine manipulation or both?

A       Both.  Sometimes I can't even judge picking up anything like I seem to drop glasses a lot.

Q       Do you lie down during - - you take two naps, is that what you said?

A       I take one nap every day.

Q       And how long is it again?

A       Usually a couple hours.

Q       Do you have any mental health care?

A       No.  I know when they did the sleep apnea test they said I have underlying symptoms of depression or something (INAUDIBLE).

Q       But you haven't pursued that?

A       No.

                                *              *              *

Q   So after '91 why didn't you work?  Because you didn't have to?

A   Because - - well, was it '91, maybe it was '94.  No, because that was when I stated having the heart problems and stuff with the atrial fib.  So that's when I didn't go to work then.  So it was '94 when we split.

Q   Okay.  And then the - - as we said the pacemaker was finally in March '03.

A   Right.

Q   Okay.

A   They had - - when I first started having the problems in '94 they had recommended it at Wheeling Medical Park then but Health Rights didn't follow-up on it.

*           *           *

Q   Stayed with him.  Do you still see Augistina in Columbus?

A   I'd seen him Friday.

Q   And what did he say?

A   And he said that from now on that Dr. Naggy could follow-up, do the follow-ups on me and if I started having anymore problems - -

Q   Go back.

A   - - that Naggy could re-contact him and he would be glad to see me again.

*           *           *

Q   Now you were at Sistersville General Hospital, what was that for?

A   I go in there for my blood work, it's where I have to have my PT's done.  And I was in there for bronchitis, in the ER for bronchitis and my asthma was flaring up from the bronchitis, they had to give me a breathing treatment then.

Q       Okay.  Does cardiac disease run in your family?

A       Yes.

Q       Your father had a heart attack?

A       Yes.

Q       What did your sister pass away from?

A       Heart disease.

Q       Okay.  And your mother?

A       She had heart trouble but cancer was what finally killed her.

*                    *                    *

EXAMINATION OF VOCATIONAL EXPERT BY ADMINISTRATIVE LAW JUDGE:

Q       At this time we'll take the testimony of Mr. Tim Mahler.  Please assume a younger individual with two years of college with no Associate Degree, however, precluded from performing all but sedentary work in a clean air environment.  Work entailing no climbing, no hazards.  With those limitations can you describe any work this hypothetical individual can perform?

A       Yes, Your Honor, with those limitations at the sedentary level there would be surveillance system monitors, 50 in the local labor market, 15, 000 nation.  There are also entry-level credit reference clerks, 300 local, 129,000 nation.  There are addressers, 250 local, 100,000 nation.  And there are laundry pricing clerks, 50 local, 15,000 nation.  These are sedentary and clean air, Your Honor.

Q       What if I added - - are they consistent with the DOT?

A       Yes, they are, Your Honor.

Q      What if I added a sit/stand option in hypothetical two, does that include those jobs?

A      You can have a sit/stand option with these jobs, yes, Your Honor.

Q      If the claimant had to lie down two hours per day, is that a tolerable (INAUDIBLE)?

A      No, Your Honor, you could not lay down for two hours in any jobs.

*          *          *

## E.  Lifestyle Evidence

The following evidence concerning Claimant's lifestyle was obtained at the hearing and through medical records.  The information is included in the report to demonstrate how the Claimant's alleged impairments affect her daily life:

Does not drive because of sleepiness.  (Tr. 791)

Makes bed and does some cleaning up around the house.  (Tr. 792)

Reads and watches Television.  (Tr. 792)

Goes grocery shopping and cooks meals for herself.  (Tr. 792)

Can lift the equivalent of a gallon of milk.  (Tr. 792)

## III.  The Motions for Summary Judgment

## A.  Contentions of the Parties

Claimant contends that the ALJ has erred in two instances in the decision entered: (1) the ALJ failed to find claimant disabled due to the combined effect of all her impairments and (2) the ALJ failed to find claimant disabled pursuant to vocational expert testimony.

Commissioner maintains that the ALJ did take into effect the combination of all of

Claimant's impairments when rendering his decision and that there is substantial evidence supporting the ALJ's finding that plaintiff could perform work that existed in significant numbers in the national economy.

## B.  The Standards

1.    Summary Judgment.  Summary judgment is appropriate if  "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears the initial burden of showing the absence of any issues of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  All inferences must be viewed in the light most favorable to the party opposing the motion.  Matsushita Elec.  Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  However, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts showing that there is a genuine issue for trial."  Anderson v.  Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

2.    Judicial Review.  Only a final determination of the Commissioner may receive judicial review.  See 42 U.S.C. §405(g), (h); Adams v. Heckler, 799 F.2d 131,133 (4th Cir. 1986).

3.    Social Security - Medically Determinable Impairment - Burden. Claimant bears the burden of showing that she has a medically determinable impairment that is so severe that it prevents her from engaging in any substantial gainful activity that exists in the national economy.  42 U.S.C. § 423(d)(1), (d)(2)(A); Heckler v. Campbell, 461 U.S. 458, 460 (1983).

24

4.     Social Security - Medically Determinable Impairment.  The Social Security Act requires that an impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques.  42 U.S.C. § 423(d)(1), (3); Throckmorton v. U.S. Dep't of Health and Human Servs., 932 F.2d 295, 297 n.1 (4th Cir. 1990); 20 C.F.R. §§ 404.1508, 416.908.

5.     Disability Prior to Expiration of Insured Status- Burden.  In order to receive disability insurance benefits, an applicant must establish that she was disabled before the expiration of her insured status.  Highland v. Apfel, 149 F.3d 873, 876 (8th Cir. 1998) (citing 42 U.S.C. §§ 416(I), 423C; Stephens v. Shalala, 46 F.3d 37, 39 (8th Cir.1995)).

6.     Social Security - Standard of Review.  It is the duty of the ALJ, not the courts, to make findings of fact and to resolve conflicts in the evidence.  The scope of review is limited to determining whether the findings of the Secretary are supported by substantial evidence and whether the correct law was applied, not to substitute the Court's judgment for that of the Secretary.  Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

7.     Social Security - Scope of Review - Weight Given to Relevant Evidence.  The Court must address whether the ALJ has analyzed all of the relevant evidence and sufficiently explained his rationale in crediting certain evidence in conducting the "substantial evidence inquiry."  Milburn Colliery Co. v. Hicks, 138 F.3d 524, 528 (4th Cir. 1998). The Court cannot determine if findings are unsupported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence.  Gordon v. Schweiker, 725 F.2d 231, 235-36 (4th Cir. 1984).

8.     Social Security - Substantial Evidence - Defined.  Substantial evidence is such

relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

Substantial evidence consists of more than a mere scintilla of evidence but may be somewhat

less than a preponderance.  Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (citations omitted).

9.    Social Security - Sequential Analysis.  To determine whether Claimant is

disabled, the Secretary must follow the sequential analysis in 20 C.F.R. §§ 404.1520, 416.920,

and determine: 1) whether Claimant is currently employed, 2) whether she has a severe

impairment, 3) whether her impairment meets or equals one listed by the Secretary, 4) whether

the Claimant can perform her past work; and 5) whether the Claimant is capable of performing

any work in the national economy.  Once Claimant satisfies Steps One and Two, she will

automatically be found disabled if she suffers from a listed impairment.  If the Claimant does not

have listed impairments but cannot perform her past work, the burden shifts to the Secretary to

show that the Claimant can perform some other job.  Rhoderick v. Heckler, 737 F.2d 714-15 (7th

Cir. 1984).

10.    Social Security - Combined Impairments.  "Congress explicitly requires that 'the

combined effect of all the individual's impairments' be considered 'without regard to whether

any such impairment if considered separately' would be sufficiently severe."  Walker v. Bowen,

889 F.2d 47 (4th Cir. 1989) (citations omitted).  "[T]he Secretary must consider the combined

effect of a claimant's impairments and not fragmentize them.  Id.  "[T]he ALJ must adequately

explain his or her evaluation of the combined effects of the impairments.  Id.

11.  Social Security - Combined Impairments.  After separately discussing Claimant's

impairments, complaints of pain, and daily level of activities, the ALJ found that her

"impairments do not prevent [claimant] from performing [his] past relevant work."  "To require a

more elaborate articulation of the ALJ's thought processes would not be reasonable." <u>Browning v. Sullivan</u>, 958 F.2d 817, 821 (8th Cir. 1991) (quoting <u>Gooch v. Secretary of H.H.S.</u>, 833 F.2d 589, 592 (6th Cir. 1987)).

12.     <u>Social Security - Vocational Expert</u>. Once it is established that a claimant cannot perform past relevant work, the burden shifts to the Social Security Administration to establish that a significant number of other jobs are available in the national economy which the claimant can perform.  20 C.F.R. §§ 404.1520(f), 416.920(f).

13.     <u>Vocational Expert Purpose.</u>  "The purpose of bringing in a vocation expert is to assist the ALJ in determining whether there is work available in the national economy which the particular claimant can perform." <u>Cline v. Chater</u>, No. 95-2076, 1996 U.S. Dist. LEXIS 8692, at *4 (4th Cir. Apr. 19, 1996).  "[R]equiring the testimony of a vocational expert is discretionary." <u>Hall v. Harris</u>, 658 F.2d 260, 267 (4th Cir. 1981).

14.     <u>Social Security - Vocational Expert - DOT - Sit/Stand option</u>.  "[T]he DOT does not state whether jobs have a sit/stand option." <u>Baranich v. Barnhart</u>, 2005 U.S. App. LEXIS 6656, *9 (6th Cir. 2005).  This does not mean that a conflict exists between the DOT and the VE's testimony.   "[T]he VE is permitted to rely on sources other than the DOT in evaluating a hypothetical." <u>Id</u>. citing 20 C.F.R. § 404.1566(d).  Claimant "is therefore incorrect to argue that the ALJ could not include a sit/stand option when such an option is not indicated in the DOT, as the DOT is only one source to be used in assessing the availability of jobs for the Claimant." <u>Id</u>. at *13.

15.     <u>Social Security - Vocational Expert - Hypothetical</u>.  In order for a vocational expert's opinion to be relevant or helpful, it must be based upon a consideration of all other

evidence in the record and it must be in response to proper hypothetical questions which fairly set out all of the claimant's impairments. Walker v. Bowen, 889 F.2d 47, 50-51 (4th Cir. 1989). The ALJ is afforded "great latitude in posing hypothetical questions," Koonce v. Apfel, No. 98-1144, 1999 WL 7864, at *5 (4th Cir. Jan.11, 1999)[5], and need only pose those that are based on substantial evidence and accurately reflect the plaintiff's limitations. Copeland v. Bowen, 861 F.2d 536, 540-41 (9th Cir. 1988).

## C. Discussion

1. Whether the ALJ Failed to Consider All of Claimant's Impairments in Combination.

Claimant contends that the ALJ did not consider the combined effects of her impairments when making his decision. She notes that she suffers from heart problems, breathing problems, inadequate sleep, dizziness, osteoarthritis, and degenerative disc disease. Claimant alleges that had the ALJ taken into account the combined effects of all these impairments he would have had to decide in her favor. Claimant further notes that the combined effect of these impairments prohibits her from sustaining gainful employment at any exertional level.

Commissioner contends that the ALJ did take into account the combined effect of all Claimant's impairments. He further contends that in making his decision the ALJ noted the combined effect of her impairments in his decision and also when he limited the types of work that Claimant could perform.

"Congress explicitly requires that 'the combined effect of all the individual's

---

[5] This Court recognizes that the United States Court of Appeals for the Fourth Circuit disfavors citation to unpublished opinions. I recognize the reasons for that position and acknowledge it. Unfortunately, there is not a better indicator of what its decision might be in this regard.

impairments' be considered 'without regard to whether any such impairment if considered separately' would be sufficiently severe." Walker v. Bowen, 889 F.2d 47 (4th Cir. 1989) (citations omitted). The ALJ cannot simply look at each individual impairment exclusively when making his decision. He must take into account the combined effect all the impairments would have on Claimant. In his opinion, the ALJ noted in several places that he did, in fact, take into account the combined effect of all impairments on Claimant. The ALJ goes through each of Claimant's impairments in detail in his reported decision. (Tr. 17-19). The ALJ then goes on to note "[p]ursuant to Social Security Ruling 02-1p, I have considered the claimant's obesity and the combined effect of her impairments. . . Furthermore, after reviewing all of the evidence, including medical records, and considering the interactive and cumulative effects of all medically determinable impairments, including any impairments that are 'severe' and/or 'non-severe,' the undersigned finds that the claimant does not have a combination of impairments that meet or medically equal any listed impairment in Appendix 1 to Subpart P of Regulations No. 4." (emphasis added) (Tr. 19). "To require a more elaborate articulation of the ALJ's thought processes would not be reasonable." Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir. 1991) (quoting Gooch v. Secretary of H.H.S., 833 F.2d 589, 592 (6th Cir. 1987)). There is substantial evidence to support that the ALJ considered the combined effect of all Claimant's impairments.

2.  Whether the ALJ Failed to Find Claimant Disabled Pursuant to Vocational Expert Testimony

Claimant contends that because Mr. Mahler, the vocational expert, stated that Claimant could not perform any job in which she was required to lay down for two hours per day, the ALJ erred in his decision. When the ALJ posed the hypothetical to the vocational expert and asked him if Claimant could lay down for two hours per day on the job, the vocational expert

responded that you could not get any job where you had to lay down for two hours.  (Tr. 804).

Commissioner contends that the vocational expert listed numerous jobs that Claimant could acquire that were plentiful in both the local and national economy.  He further contends that there had been no orders by any physician, or other person, that Claimant was required to lay down for two hours per day.

"The purpose of bringing in a vocation expert is to assist the ALJ in determining whether there is work available in the national economy which the particular claimant can perform." Cline v. Chater, No. 95-2076, 1996 U.S. Dist. LEXIS 8692, at *4 (4th Cir. Apr. 19, 1996).  In order for a vocational expert's opinion to be relevant or helpful, it must be based upon a consideration of all other evidence in the record and it must be in response to proper hypothetical questions which fairly set out all of the claimant's impairments.  Walker v. Bowen, 889 F.2d 47, 50-51 (4th Cir. 1989).  The ALJ's hypothetical question to the vocational expert asked him to "assume a younger individual with two years of college with no Associate Degree, however, precluded from performing all but sedentary work in a clean air environment.  Work entailing no climbing, no hazards.  With those limitations can you describe any work this hypothetical individual can perform?"  (Tr. 803).  This hypothetical properly took into account all of Claimant's impairments and the effects on the type of work she could perform.  The vocational expert answered with a number of jobs that Claimant could perform, including surveillance system monitor, credit reference clerk, addresser, and laundry pricing clerk.  (Tr. 803).  The ALJ then went on to ask if there were any jobs that Claimant could perform while having to lay down for two hours per day, in which the vocational expert responded that there was not.  (Tr. 804).

It is the duty of the ALJ, not the courts, to make findings of fact and to resolve conflicts

in the evidence. The scope of review is limited to determining whether the findings of the Secretary are supported by substantial evidence and whether the correct law was applied, not to substitute the Court's judgment for that of the Secretary. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Substantial evidence consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (citations omitted).

In the present case, there is substantial evidence to support the ALJ's finding that there is work in significant numbers in the economy available to Claimant pursuant to vocational expert testimony. Testimony from the vocational expert stated that many jobs were available to a person in a situation similar to Claimant's. He was also of the opinion that she could not perform these jobs if required to lay down for two hours a day. However, there was no credible evidence that Claimant was required to lay down for two hours every day. No physician found claimant had to lie down for two hours every day. The only evidence claimant had to lie down for two hours every day was claimant. Claimant testified that she took a two hour nap every day. There was no evidence, including her testimony, that she would have to take a two hour nap every day. She did not say she could not work because of naps when stating only her hand problems would keep her from working. (Tr. 10). Therefore, there is substantial evidence to support the ALJ's decision that there were jobs plentiful in both local and national economies that Claimant could perform.

## IV.  Recommendation

For the foregoing reasons, I recommend that:

1.      Claimant's Motion for Summary Judgment be **DENIED**.  The ALJ's conclusion that there is sedentary work existing in significant numbers in the national economy that Claimant could perform, given her age, education, work experience and residual functional capacity is supported by substantial evidence.  Furthermore, the ALJ did take into account all of the disabilities Claimant suffered from combined when he made the decision.  In this case, there is substantial evidence to support the ALJ's decision such that it should be affirmed.

2.      Commissioner's Motion for Summary Judgment be **GRANTED** for the same reasons set forth above.

Any party who appears *pro se* and any counsel of record, as applicable, may, within ten (10) days of the date of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection.  A copy of such objections should be submitted to the District Court Judge of Record.  Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

DATED: July 21, 2009

                                          *James E. Seibert*
                                          JAMES E. SEIBERT
                                          UNITED STATES MAGISTRATE JUDGE